**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) **COMPLAINT FOR A CIVIL CASE** |
| Plaintiff, | ) Case No.<br>) |
| v. | )<br>) **JURY TRIAL DEMANDED** |
| SUBURBAN HEIGHTS LLC,<br>CRESTLINE PROPERTY LLC,<br>TRILINE PROPERTIES LLC, and<br>JINGLE PROPERTIES LLC, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

The United States of America ("United States") alleges as follows:

## NATURE OF THIS ACTION

1. The United States brings this action to enforce the provisions of Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. §§ 3601-3619 (the "Fair Housing Act").

2. The United States alleges that the Defendants discriminated based on race and/or color against prospective Black tenants at the Suburban Heights Apartments property ("Suburban Heights" or the "property") in Kinloch, Missouri, by banning tenants with certain criminal histories. Specifically, from at least November 2015 to January 2024, the Defendants publicized and enforced a categorical ban on tenants with past felony convictions and certain other criminal convictions and histories at Suburban Heights. This policy excluded potential tenants based on their criminal histories, which are known to have significant statistical racial disparities. Moreover, the criminal records and histories that the policy considers are not accurate proxies for actual underlying criminal activity, and are not reliable predictors of future criminal activity. By choosing to use that policy, the Defendants likely deterred prospective Black tenants from

applying to rent and excluded them from housing opportunities at their property. Through their conduct as described in this Complaint, the Defendants engaged in a pattern or practice of discrimination against prospective Black tenants, and denied rights to a group of persons, where such denial raises an issue of general public importance, under 42 U.S.C. § 3614(a).

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 3614(a).

4. Venue is proper under 28 U.S.C. § 1391(b) because Suburban Heights, the property that is the subject of the action, is situated in this District, and the events giving rise to the claims occurred in this District.

## THE DEFENDANTS AND THE SUBJECT PROPERTY

5. Suburban Heights is a residential multifamily rental apartment complex located at 5512 Mable Ave. in Kinloch, Missouri. It contains approximately 102 rental units in six two-story buildings.

6. Suburban Heights is a "[d]welling" within the meaning of 42 U.S.C. § 3602(b).

7. Defendant Suburban Heights LLC is a perpetual limited liability company with a principal address in St. Louis, Missouri. Suburban Heights LLC was incorporated in Missouri in July 2012 for the purpose of developing commercial real estate.

8. Suburban Heights LLC owned and managed Suburban Heights from approximately 2012 until March 2021.

9. During Suburban Heights LLC's ownership of the property, its principal Michael Becker personally managed and/or supervised the management of the property.

10. Defendant Jingle Properties LLC ("Jingle") is a limited liability company with a principal address in Tulsa, Oklahoma. It has owned Suburban Heights since approximately March 2021.

11. Defendant Crestline Property LLC ("Crestline") is a limited liability company with a principal address in Tulsa, Oklahoma. Crestline registered as a foreign corporation in Missouri on or about April 1, 2022. Crestline was the property manager for Suburban Heights from approximately March 2021 until approximately late 2023.

12. Defendant Triline Properties LLC ("Triline") is a limited liability company with a principal address in Tulsa, Oklahoma. Triline registered as a foreign corporation in Missouri on or about November 20, 2023. Triline has been the property manager for Suburban Heights since approximately late 2023.

13. During Jingle's ownership of the property, under both Crestline's and Triline's management, Chris Burgin has personally managed and/or supervised the management of the property. Mr. Burgin is a principal and owner of both Crestline and Triline.

## FACTUAL ALLEGATIONS

### Renovation and marketing of Suburban Heights

14. Defendant Suburban Heights LLC renovated Suburban Heights after purchasing the property, and reopened the property in or around 2014.

15. Since its reopening, Suburban Heights has had approximately 102 rental apartment units, including approximately eight one-bedroom units, 49 two-bedroom units, and 45 three-bedroom units. The property includes six two-story buildings and adjacent surface parking lots, and is enclosed by a tall fence and gate.

16. Since its reopening, Suburban Heights has been marketed towards students, particularly students at the University of Missouri-St. Louis ("UMSL"). It is not formally affiliated with UMSL and does not restrict occupancy of its units to UMSL or other students.

17. For example, from at least November 2015 until at least late 2023, the Suburban Heights website, *http://suburbanheightsapartments.com*, described the property as a "student village," highlighted its proximity to UMSL, featured testimonials from UMSL and other student tenants, and contained links to UMSL resources. Its homepage banner stated, "Be Part of Our Student Village," and the tagline on its URL read, "Suburban Heights Apartments – Your Student Village Near UMSL." Suburban Heights also offered discounted rent to UMSL students and advertised that it did so on its website.

18. Since around early 2024, some of the student-focused language described in the preceding paragraph was removed from the Suburban Heights website. But the website continues to feature testimonials from student tenants and contain links to UMSL resources.

19. According to UMSL's publicly available fall semester enrollment statistics from 2016 to 2023, approximately 60-64% of students who enrolled during that period were White and 16-18% were Black.

### City of Kinloch, Missouri

20. Suburban Heights is in the City of Kinloch ("Kinloch"), Missouri, just outside the City of St. Louis, and within St. Louis County. Kinloch is located between the City of Ferguson, Missouri, and the St. Louis International Airport.

21. According to Kinloch's website, Kinloch became the first all-Black incorporated community in Missouri in 1948.[1] It was a thriving town of about 7,000 people for many years. In the 1970s, the town's population began to decline. In the 1980s and 1990s, the City of St. Louis bought almost all the land in Kinloch for noise abatement near the airport, and the town's population declined precipitously. Kinloch lost nearly 90% of its residents between 1980 and 2000.

22. According to the United States Census, by 2010, the population of Kinloch was 298 persons. Of this population, 282 residents (or 94.6%) were Black, and 10 residents (or 3.4%) were White. By 2020, the population of Kinloch was 263 persons. Of this population, 148 residents (or 56.3%) were Black, and 79 residents (or 30.0%) were White. In other words, between 2010 and 2020, Kinloch lost nearly half of its Black population (declining from 282 to 148 persons), while its White population grew almost eight-fold (increasing from 10 to 79 persons).

23. In 2020, the United States Census reported that there were 182 total housing units in Kinloch. This means that in 2020, the 102 apartments at Suburban Heights comprised approximately 56% of the total housing stock of the City of Kinloch.

**Publication of the Defendants' discriminatory Policy**

24. From at least November 10, 2015, to approximately January 2024, the Defendants, during their respective ownership and management tenures, published "LEASING CRITERIA" on Suburban Heights' website that included the following:

CRIMINAL BACKGROUND CHECK

---

[1] *See https://kinlochmo.org/resources/history.php.*

5

> A criminal background check will be completed on all household members age 17 and over. The history must reflect no felony convictions, deferred, or withhold [*sic*] adjudication for a felony or misdemeanor for a crime against a person, any type of sex crime or a crime considered a threat to real or personal property [*sic*] to adversely affect the health and safety of other person [*sic*] or to interfere with the quiet enjoyment of other persons.

25. This Complaint refers to the policy described in the preceding paragraph as Suburban Heights' "Criminal History Ban" or "Policy."

26. Both as written and as enforced, the Policy excludes all persons with felony convictions or certain other criminal histories, regardless of the nature of the conviction, how long ago it occurred, evidence of rehabilitation, or any other factor related to whether a specific person poses any threat to safety or property.

27. Suburban Heights' website's "LEASING CRITERIA" page from at least November 10, 2015, to approximately January 2024, included the following, as the first provision in the list of leasing criteria:

> SUBURBAN HEIGHTS APARTMENTS RESIDENTIAL SELECTION CRITERIA
>
> A complete application, credit and background check with a third party agency will be completed on all household occupants age 19 and over and fees charged accordingly for each.

28. The Defendants charge prospective tenants a fee to submit an application.

**Enforcement of the Defendants' discriminatory Policy**

29. At all relevant times, the Defendants inquired about and gathered information about applicants' criminal histories.

30. For example, it was the policy during the ownership or management of all Defendants to require rental agents to run background reports on all applicants, including screening for criminal histories, through a third-party tenant screening company.

6

31. As another example, under Jingle's ownership since 2021, the application form has asked applicants, "Have you ever been convicted of a crime?"

32. The Defendants have implemented and enforced their Criminal History Ban directly and through rental agents or other employees acting as agents of the Defendants.

33. For example, the Department of Justice conducted two rental tests on Suburban Heights from January to April 2022. "Testing" in this context refers to the use of individuals who, without an intent to rent an apartment, pose as prospective tenants for the purpose of gathering information that may indicate whether illegal discrimination is occurring.

34. In the first test, in a series of phone and email communications between January to March 2022, a tester posing as a prospective tenant with a "felony for a laptop in 2010" asked the Suburban Heights' rental agent via email whether he would be eligible to rent with a conviction from 11 years ago, after the rental agent informed him via email that "[t]he application process includes a credit and background check." On January 28, 2022, a rental agent responded by email: "Ownership will make the final decision regarding background check results. We will have to reach out to them and see, which we can do before you apply." On March 4, 2022, the tester called Suburban Heights, and another rental agent told him that the property typically denies for felonies. Finally, in an email on March 8, 2022, a rental agent told the tester: "I was able to reach out to ownership and said [*sic*] that felony convictions are grounds for application denial. We wanted to be upfront about this to avoid wasting your time or money for application fees."

35. In the second test, a tester posing as a prospective tenant with a felony conviction from ten years ago for stolen car parts called Suburban Heights on April 28, 2022. After the agent told him that they do a credit and background check on all adults, the tester asked the

7

rental agent whether that conviction would affect his application. The rental agent responded, "I will be totally upfront with you. We do typically deny for felonies." She then said she would "double check with ownership," but repeated that "we do typically deny for felonies." The rental agent responded to the tester by email on May 2, 2022, stating: "We did check with ownership. Unfortunately, we will not be able to accept your application. We want to be upfront with you about this so as not to waste your time or money."

### Prospective tenants

36. At all relevant times, Suburban Heights has offered conventional, market-rate housing, which is open to the public and not limited to low-income tenants or another specific applicant pool.

37. The applicant pool for Suburban Heights is the general population of the surrounding geographic area, including St. Louis City and St. Louis County, or the general population of renters in that area.

38. The Defendants do not maintain data or records reflecting the race of applicants, tenants, and prospective tenants, including persons who have inquired about renting a unit but not submitted an application.

39. The public posting of the Policy on Suburban Heights' website, as well as the direct communication of the Policy to prospective tenants by the Defendants' employees and agents, likely deterred prospective tenants with a criminal background from applying based on a belief that applying would be futile. As a result, Suburban Heights' actual applicants may be skewed in favor of persons without criminal histories covered by the Policy.

40. As a direct result of the Defendants' Policy, prospective tenants with a past felony conviction or certain other criminal histories were likely deterred from applying to Suburban Heights after learning of the Policy or were denied because of the Policy.

### Black-White disparities in conviction and incarceration rates

41. It is well documented and known that there are statistical Black-White racial disparities in conviction and incarceration rates.[2]

42. Incarceration data indicates that Black individuals are significantly more likely than White individuals to have the types of convictions covered by Suburban Heights' Criminal History Ban. This is true nationwide and, to an even greater extent, in St. Louis City and St. Louis County.

43. Black individuals are at least four times, and often more than five times, more likely than White individuals to be incarcerated in prisons, both at any given point in time and over the course of their lifetimes.

44. For example, national Black-White disparities in prison incarceration rates, using the most recent point-in-time data available (2018 to 2022), are consistently approximately 5:1. Specifically, national rates of prison incarceration for non-Hispanic Black and White individuals in the United States per 100,000 members of the population were: in 2018, 1124 (Black) to 218 (White), a disparity of 5.18 to one; in 2019, 1088 (Black) to 214 (White), a disparity of 5.09; in

---

[2] *See, e.g.*, U.S. Department of Housing and Urban Development ("HUD"), Office of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records by Providers of Hous. & Real Estate-Related Transactions (Apr. 4, 2016) ("HUD 2016 Guidance"), at 2, *https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF* ("Across the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population.") (citing multiple sources).

2020, 941 (Black) to 183 (White), a disparity of 5.15; in 2021, 901 (Black) to 181 (White), a disparity of 4.99; and in 2022, 911 (Black) to 188 (White), a disparity of 4.85.[3]

45.     As another example, longitudinal study data on a cohort of individuals in the United States who have been followed since the late 1970s show that 10.59% of non-Hispanic Black individuals, but only 2.19% of non-Hispanic White individuals, have ever experienced incarceration as of 2020.[4] In other words, non-Hispanic Black individuals are 4.84 times as likely to ever experience jail or prison incarceration as are non-Hispanic White individuals; and 8.22 percent more non-Hispanic Black individuals have ever experienced jail or prison incarceration than non-Hispanic White individuals.

46.     The Black-White disparities in prison incarceration in the latest data available for St. Louis City and St. Louis County are at least as large as, and almost always exceed, the national disparities. For example, the rates of prison incarceration for Black and White individuals in St. Louis City per 100,000 members of the population based on point-in-time counts at the end of 2019 and 2020 were: in 2019, 2164 (Black) to 299 (White), a disparity of 7.34 to one; and in 2020, 1799 (Black) to 190 (White), a disparity of 9.47. The rates of prison incarceration for Black and White individuals in St. Louis County per 100,000 members of the population were: in 2019, 690 (Black) to 122 (White), a disparity of 5.66 to one; and in 2020,

---

[3] *See, e.g.,* Carson, E. Ann *et al*. November 2023. Prisoners in 2022–Statistical Tables. Bureau of Justice Statistics, at *https://bjs.ojp.gov/document/p22st.pdf* (annual point-in-time counts of individuals incarcerated in prisons by race); United States Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, Bridged-Race Population Estimates, United States July 1st resident population by state, county, age, sex, bridged-race, and Hispanic origin, at *http://wonder.cdc.gov/bridged-race-v2020.html* ("CDC Population Counts 2023").

[4] Bureau of Labor Statistics, United States Department of Labor, National Longitudinal Survey of Youth 1979 cohort, 1979-2016 (2020) ("NLSY 1979").

537 (Black) to 83 (White), a disparity of 6.47.[5] In other words, Black individuals were over five to nine times as likely as White individuals to be incarcerated in prison in St. Louis City or St. Louis County during the point-in-time counts in 2019 and 2020.

47. These Black-White statistical disparities in incarceration rates are an appropriate proxy and the best available evidence for the statistical disparities in rates of the types of convictions covered by Suburban Heights' Criminal History Ban. That Policy categorically bars persons with any felony conviction and also includes vague and broad additional exclusions for certain more serious types of misdemeanors. Because felony convictions tend to lead to prison incarceration, prison incarceration data are the best proxy for the categories of criminal histories covered by the Suburban Heights' Policy.[6] Moreover, data on incarceration rates are more readily available and of higher quality than data on conviction rates.[7]

---

[5] Bureau of Justice Statistics. 2023c. National Corrections Reporting Program, *https://bjs.ojp.gov/data-collection/national-corrections-reporting-program-ncrp*; CDC Population Counts 2023, *supra*, *http://wonder.cdc.gov/bridged-race-v2020.html*.

[6] *See, e.g.*, Bureau of Justice Statistics, *https://bjs.ojp.gov/preliminary-data-release-prisons* (96% of all persons in prison in the United States at year end 2022 had been sentenced to more than one year). ("[F]elony" generally means "an offense punishable by a maximum term of imprisonment of more than one year." *See* 18 U.S.C. § 3156(a)(3).)

[7] *See, e.g.*, Shannon, Sarah K.S. *et al.*, "The Growth, Scope, and Spatial Distribution of People with Felony Records in the United States, 1948–2010," Methodological Appendix at Duke Univ. Press (Sept. 11, 2017), *http://read.dukeupress.edu/demography/article-pdf/54/5/1795/839647/1795shannon.pdf* (highlighting lack of available quality data on convictions and generating national estimate of felony convictions by focusing on prison data combined with educated assumptions).

**Past criminal histories overstate Black-White disparities in criminal activity and do not reliably predict future criminal activity**

48. The criminal histories and records that Suburban Heights' Policy considers markedly overstate Black-White disparities in underlying criminal activity, and also do not reliably predict future criminal activity.

49. First, extensive data show that Black-White disparities in incarceration and conviction rates markedly overstate disparities in underlying criminal activity. In other words, Black individuals do not commit disproportionately more crimes than White individuals at a rate consistent with the disparities in their incarceration or conviction rates.

50. For example, multiple studies show that Black individuals are more likely than White individuals to be stopped and/or searched by police officers, whether on foot or in an automobile, yet these higher rates of stops and searches do not correlate to correspondingly higher rates of underlying criminal activity being committed by Black as compared to White individuals.[8]

51. For another example, data also show that, compared to White individuals, Black individuals have significantly higher rates of drug-related arrests, and rates of conviction and

---

[8] *See, e.g.,* Investigation of the Ferguson Police Department, DOJ Civil Rights Division (March 4, 2015), *at https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf* (finding in investigation of the Police Department of Ferguson, MO, a municipality in St. Louis County adjacent to Kinloch, MO, that Black individuals in Ferguson were 2.07 times more likely to be searched during a vehicular stop but were 26% less likely to have contraband found on them during a search than White individuals; and that Black individuals accounted for 85% of traffic stops from 2012 to 2014, despite making up 67% of the population); HUD implementation of HUD 2016 Guidance (June 10, 2022) ("HUD 2022 Guidance"), at 2 n.7, *https://www.hud.gov/sites/dfiles/FHEO/documents/Implementation%20of%20OGC%20Guidance%20on%20Application%20of%20FHA%20Standards%20to%20the%20Use%20of%20Criminal%20Records%20-%20June%2010%202022.pdf* (citing studies).

incarceration for drug-related crimes, relative to their corresponding rates of underlying drug use.[9]

52.     Second, an individual's risk of criminal activity rapidly declines as time passes. Data show that individuals with criminal histories are no more likely to be involved in criminal activity than are individuals in the general population after a certain amount of time has passed from their last contact with the criminal legal system. For most adults who were once criminally active, that amount of time is, on average, less than 3-7 years at the very most.[10]

53.     Moreover, when the "lookback" window (the number of years to look back to see if an individual has had contact with the criminal legal system) shrinks, the Black-White absolute disparities in incarceration rates laid out above diminish substantially. The shorter the "lookback" window, the smaller the Black-White absolute disparity.[11]

---

[9] *See, e.g.*, HUD 2022 Guidance, *supra*, at 2 n.7 (citing April 2020 study citing data showing that Black individuals are 3.6 times as likely to get arrested for marijuana possession than White individuals, despite similar usage rates); Mitchell, Ojmarrh, and Michael S. Caudy, 2015, "Examining racial disparities in drug arrests," *Justice Quarterly* 32(2), 288-313 (finding based on nationally representative NLSY 1979 data that 57.0% of Black youth and 63.4% of non-Hispanic White youth were likely to have committed any drug offending, but 10.4% of Black Americans compared to 6.8% of non-Hispanic White Americans had experienced a drug arrest, meaning Black Americans were 53% more likely to have been arrested for a drug crime).

[10] Blumstein, Alfred, and Kiminori Nakamura, 2009, "Redemption in the presence of widespread criminal background checks," *Criminology* 47(2), 327-359, at 339 (analyzing data from New York showing that individuals who were first arrested at age 20 were no more likely to be involved in criminal activity than individuals in the general population after 4.4 years (those arrested for robbery), 3.2 years (those arrested for burglary), and 3.3 years (those arrested for aggravated assault), which are three common crimes).

[11] NLSY 1979, *supra* (showing in large, nationally representative dataset that 10.59% of non-Hispanic Black individuals but only 2.19% of non-Hispanic White individuals, or an 8.40% absolute disparity, had ever been incarcerated; whereas looking back 10 years, the cumulative prevalence drops to 6.05% for Black individuals and 1.04% for White individuals, or a 5.01% absolute disparity; and looking back seven years the cumulative prevalence drops to 2.77% for Black individuals and 0.58% for White individuals, or a 2.19% absolute disparity).

54. Third, there are serious concerns about inaccuracies in the reports of criminal records of the type that Suburban Heights' Policy considers.

55. For example, in Guidance issued in 2016 ("HUD 2016 Guidance"), the U.S. Department of Housing and Urban Development cautioned that conviction records may contain errors or be outdated because databases may continue to report a conviction that was later expunged, or databases may report as a felony an offense that was subsequently downgraded to a misdemeanor.[12] Additionally, lower court records may not show the ultimate disposition of a case decided in another court. And searches relying on name-plus-identifier (such as social security number) are often incorrect, in part because there has been a trend towards databases not using social security numbers. This can result in criminal record information being matched with the wrong individual.

56. Major industry organizations have disseminated information about the HUD 2016 Guidance and recommended that housing providers do not use categorical criminal history bans.[13]

---

[12] HUD 2016 Guidance, at 7 n.29, *https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF* (citing SEARCH, National Consortium for Justice Information and Statistics, Report of the National Task Force on the Commercial Sale of Criminal Justice Record Information (2005), at *http://www.search.org/files/pdf/RNTFCSCJRI.pdf*).

[13] *See, e.g.*, National Association of Realtors, "Fair Housing Act: Criminal History-Based Practices and Policies," Jan. 9, 2020, *at https://www.nar.realtor/articles/fair-housing-act-criminal-history-based-practices-and-policies* (recommending that housing providers do not create "blanket exclusion[s]," but instead "[c]onduct individualized assessments that take into account mitigating factors"); National Multifamily Housing Council and National Apartment Association, "Criminal Conviction Screening Policies: Best Practices to Avoid Disparate Impact Liability," May 2016, *at https://www.naahq.org/sites/default/files/naa-documents/government-affairs/protected/business-management-operations/fair-housing/criminal-conviction-screening-policies-white-paper-2016-05-final_1.pdf* (recommending similar best practices).

57. In addition, the tenant screening company used by Crestline and Triline to assess applications at Suburban Heights, AppFolio, acknowledges in its tenant screening reports that reporting of such histories "is based upon limited identification information and varies according to restrictions placed on reporting by the different court jurisdictions," and makes clear that it "cannot guarantee that the record match(es) definitively belong to the applicant."[14]

## Black individuals are disproportionately renters in St. Louis City and St. Louis County

58. Black individuals are disproportionately renters in St. Louis City and St. Louis County.

59. The population of St. Louis County was estimated to be 987,059 as of July 1, 2023, of which 66.9% were White and 25.3% were Black.[15] The population of St. Louis City was estimated to be 281,754 as of July 1, 2023, of which 46.3% were White and 43.9% were Black.[16]

60. Black individuals are almost twice as likely in St. Louis City, and more than twice as likely in St. Louis County, as White individuals to be seeking or living in rental housing. Specifically, in St. Louis City in 2020, 46.3% of renters were Black and 28.8% of renters were White, while 43.0% of the population was Black and 44.0% of the population was White—a disparity of 1.6 to one. In St. Louis County in 2020, 40.3% of renters were Black and 46.2% of

---

[14] AppFolio Sample Screening Report, at *https://cdn.brandfolder.io/GYMK570U/as/k3qsshr9gk8jx5z3jxkhvrb/ScreeningReport_vantage_goodsample_2.png*.

[15] U.S. Census Bureau, "QuickFacts," St. Louis County, Missouri, *https://www.census.gov/quickfacts/fact/table/stlouiscountymissouri/PST045223*.

[16] U.S. Census Bureau, "QuickFacts," St. Louis City, Missouri, *https://www.census.gov/quickfacts/fact/table/stlouiscitymissouri/PST045223*.

15

renters were White, while only 25.0% of the population was Black and 63.0% of the population was White—a disparity of 2.2 to one.[17]

## Conclusion

61. Suburban Heights' Policy discriminated against Black prospective tenants. In the St. Louis area, where renters are disproportionately Black, the Policy caused or predictably would have caused a discriminatory effect on Black renters, including for the reasons described above. Prospective tenants with criminal histories covered by the Policy were likely deterred from applying and/or were denied the opportunity to qualify for Suburban Heights' housing because of the Policy. The Defendants chose to adopt and enforce this Policy, which predictably excludes Black prospective tenants at a higher rate than White prospective tenants from the opportunity of applying and qualifying for its housing.

62. The criminal histories and records the Policy considers overstate Black-White disparities in underlying criminal activity, are not accurate proxies for underlying criminal activity, and are not reliable predictors of future criminal activity, including for the reasons described above.

---

[17] U.S. Department of Commerce, U.S. Census Bureau (2024), "Homeownership by Race and Ethnicity of Household. Homeownership Rate by County,"
*https://www.census.gov/library/visualizations/interactive/homeownership-by-race-and-ethnicity-of-householder.html*;
*https://data.census.gov/profile/St._Louis_city,_Missouri?g=050XX00US29510* (2020 Census showing total population of 301,578, including 129,814 Black individuals and 132,292 White individuals); *https://data.census.gov/profile/St._Louis_County,_Missouri?g=050XX00US29189* (2020 Census showing total population of 1,004,125, including 246,642 Black individuals and 632,283 White individuals). For purposes of these allegations, the "disparity" is calculated by comparing the Black renter percentage out of the overall Black population percentage, to the White renter percentage out of the overall White population percentage.

63. The Policy is artificial, arbitrary, and unnecessary, including for the reasons described above.

64. The Defendants cannot show that Suburban Heights' Policy is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests, including for the reasons described above.

65. Less discriminatory alternatives exist to achieve any potential legitimate interests the Defendants may claim they have in the Policy, including public safety. For example, Defendants could have adopted a shorter "lookback" period or adopted an individualized assessment to take into consideration relevant mitigating information for prospective tenants with criminal histories.[18] These approaches would have lessened racial disparities without compromising public safety goals. However, Defendants failed to adopt these less discriminatory alternatives to the Policy.

## LIABILITY

66. Each Defendant is directly and vicariously liable for the discriminatory conduct alleged during that Defendant's ownership and/or management of Suburban Heights, including for adopting, posting, and enforcing the discriminatory Policy.

67. At all times relevant to the allegations in this lawsuit, the conduct of any rental agent and/or property manager at Suburban Heights as alleged in this Complaint was performed in his or her role as agent of the Defendant(s) who owned and/or managed the property at that time, and the agent was acting with actual and/or apparent authority pursuant to that agency.

---

[18] *See, e.g.*, HUD 2016 Guidance, at 7 (recognizing that "individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record is likely to have a less discriminatory effect than categorical exclusions" and providing many of the above examples of such relevant individualized evidence).

68. During Suburban Heights LLC's ownership of Suburban Heights, rental agents and/or property managers were employees and/or agents of Defendant Suburban Heights LLC. Defendant Suburban Heights LLC is liable for the conduct alleged in this Complaint during its ownership and management of the property.

69. During Jingle's ownership of Suburban Heights, rental agents and/or property managers were employees and/or agents of Defendants Jingle, Crestline, and/or Triline. Defendants Jingle, Crestline, and Triline are liable for the conduct alleged in this Complaint during their respective ownership or management of the property.

70. The Defendants failed to take prompt action to correct and end the discriminatory housing practices alleged in this Complaint, and they knew or should have known of the discriminatory conduct.

71. The Defendants' discriminatory conduct was intentional, willful, and/or taken in reckless disregard of the law.

## CLAIM FOR RELIEF

72. By the conduct described above, the Defendants have denied housing or otherwise made housing unavailable because of race and/or color, in violation of 42 U.S.C. § 3604(a).

73. By the conduct described above, the Defendants have engaged in a pattern or practice of resistance to the full enjoyment of the rights granted by the Fair Housing Act, under 42 U.S.C. § 3614(a).

74. The Defendants' conduct described above constitutes a denial to a group of persons of rights granted by the Fair Housing Act that raises an issue of general public importance, under 42 U.S.C. § 3614(a).

75. Persons, such as prospective Black tenants who were deterred from applying or denied housing at Suburban Heights, who have been injured and suffered damages because of the Defendants' discriminatory conduct described above, are "aggrieved persons" as defined in 42 US.C. § 3602(i).

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court enter judgment against the Defendants and enter an order that:

1. Declares that the Defendants' actions, policies, and practices, as alleged in this Complaint, violate the Fair Housing Act;

2. Enjoins the Defendants, their agents, employees, and successors, and all other persons in active concert or participation with them, from:

    a. Engaging in discrimination on the basis of race or color in any aspect of the rental or lease of a dwelling;

    b. Failing or refusing to take such affirmative steps as may be necessary to restore the aggrieved persons, as nearly as practicable, to the position they would have been in but for the discriminatory conduct; and

    c. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of the Defendants' unlawful housing practices;

3. Awards monetary damages to persons aggrieved by the Defendants' discriminatory conduct, as authorized by 42 U.S.C. § 3614(d)(1)(B);

4. Assesses a civil penalty against the Defendants to vindicate the public interest, as authorized by 42 U.S.C. § 3614(d)(1)(C) and 28 C.F.R. § 85.3(b)(3); and

5. Awards such additional relief as the interests of justice may require.

Dated:  October 3, 2024

Respectfully submitted,

|  |  |
|---|---|
|  | MERRICK B. GARLAND<br>Attorney General |
| SAYLER A. FLEMING<br>United States Attorney<br>Eastern District of Missouri | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
|  | CARRIE PAGNUCCO<br>Chief |
| */s/ Regan Hildebrand*<br>REGAN HILDEBRAND<br>Bar No. 6326374 (IL)<br>Bar No. 57438 (MO)<br>Assistant U.S. Attorney<br>Civil Rights Coordinator<br>United States Attorney's Office<br>Eastern District of Missouri<br>Thomas F. Eagleton U.S. Courthouse<br>111 South Tenth St., 20th Fl.<br>Saint Louis, MO 63102<br>Phone: (314) 539-7703<br>Fax: (314) 539-2287<br>regan.hildebrand@usdoj.gov | */s/ Katie Legomsky*<br>MEGAN K. WHYTE DE VASQUEZ<br>Deputy Chief<br>ANNA PURINTON<br>Bar No. 999246 (DC)<br>KATIE LEGOMSKY<br>Bar No. 275571 (CA)<br>Trial Attorneys<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>4 Constitution Square<br>150 M Street, NE<br>Washington, DC 20530<br>Phone: (202) 598-6587<br>Fax: (202) 514-1116<br>anna.purinton@usdoj.gov<br>kathryn.legomsky@usdoj.gov |

Attorneys for Plaintiff
United States of America